IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

**Plaintiff,**

v.                                    **CRIMINAL NO. 23-235 (RAM)**

FÉLIX ANTONIO TOLEDO-VILLANUEVA,

**Defendant.**

_____

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, United States District Judge.

Pending before the Court is Defendant Félix Antonio Toledo-Villanueva's ("Mr. Toledo-Villanueva" or "Defendant"), November 13, 2023 *Motion to Suppress* and the Government's *Opposition* thereto. (Docket Nos. 29 and 35). Having held a suppression hearing on May 9, 2024 and reviewed the parties' arguments and evidence, the Court hereby **GRANTS IN PART** Defendant's *Motion to Suppress.*

**I.    PROCEDURAL BACKGROUND**

On June 7, 2023, a Grand Jury issued a one-count Indictment charging Mr. Toledo-Villanueva with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). (Docket No. 1) Specifically, the Indictment charged Defendant with knowingly possessing one Colt revolver, .38 caliber, bearing

serial number A35422; thirty-three rounds of .38 caliber ammunition; and one round of .22 caliber ammunition. Id. at 1.

On November 13, 2023, Defendant filed the pending *Motion to Suppress*. (Docket No. 29). Mr. Toledo-Villanueva alleges that on May 30, 2023, the Puerto Rico Police Department ("PRPD") arrested Defendant in his residence pursuant to an outstanding arrest warrant and proceeded to conduct a warrantless, illegal search of his residence. Id. at 1. Defendant claims that he was inside of his residence when he heard someone calling his name, and that the PRPD subsequently proceeded to break the back door of his residence. Id. at 3. He also maintains that he was arrested and patted down, and that there were no firearms on his person or within his immediate control. Id. at 4. Mr. Toledo-Villanueva alleges that the PRPD then searched the entire house, including closets and drawers, without his consent or a search warrant. Id. As a result of this search, the PRPD seized the following: a Colt revolver caliber .28 loaded with six rounds of .38 caliber ammunition; two pneumatic 9mm pistols; seven rounds of pneumatic 9mm ammunitions; twenty-seven rounds of .38 caliber ammunitions; one round of .22 caliber ammunition; drug paraphernalia; and one plastic baggie containing a powdery substance. Id. at 2-3.

The Government filed an *Opposition* questioning Defendant's Fourth Amendment standing and arguing that a search warrant was not required because both the hot pursuit and plain view doctrines

applied. (Docket No. 35). The Government asserts that the hot pursuit doctrine applies because when the PRPD agents first arrived at the residence, Mr. Toledo-Villanueva was walking outside of the home and, once he noticed the agents, quickened his pace and entered the home. Id. at 2. Additionally, the Government alleges that when Defendant was arrested, agents patted him down and found a fully loaded .38 caliber Colt revolver on his person. Agents then purportedly discovered the remaining items on top of a table in the room where Defendant was arrested, in plain view and within Defendant's immediate control. Id. at 7. Furthermore, the Government maintains that the suppression of the seized items does not advance the purpose of the exclusionary rule. Id. at 10.

On May 9, 2024, the Court held a suppression hearing. (Docket No. 42). At the hearing, Defendant presented multiple photos of the residence and the testimony of his half-sister, Michelle Johnson-Villanueva ("Ms. Johnson"), who testified about the ownership of the residence and the state of the home following Mr. Toledo-Villanueva's arrest. On its part, the Government presented the testimonies of PRPD Agents Jose Gonzalez ("Agent Gonzalez") and Norberto Jimenez-Roman ("Agent Jimenez"), both of whom testified as to the circumstances related to Defendant's arrest, as well as the testimony of Mr. Toledo-Villanueva's neighbor, Idalia Feliciano-Ramos ("Ms. Feliciano").

## II.  FACTUAL BACKGROUND

In light of the testimony and evidence presented at the May 9, 2024, suppression hearing, the Court makes the following relevant findings of fact:

1. Mr. Toledo-Villanueva was arrested on May 30, 2023 at a residence located at Crystal #69, Aguadilla, Puerto Rico.

2. The residence previously belonged to Defendant's mother but, after her death, it is part of the inheritance that belongs to Defendant and his two siblings, Ms. Johnson and Jean Carlos Toledo-Villanueva.

3. Defendant has lived in that residence his entire life.

4. At the time of his arrest, Defendant lived in the residence alone.

5. On May 30, 2023, Agents Gonzalez and Jimenez (collectively referred to as the "PRPD Agents"), were investigating an arson that occurred on May 28, 2023, at the residence of Mr. Toledo-Villanueva's former partner.

6. Defendant's former partner informed the PRPD Agents that she suspected Mr. Toledo-Villanueva could be responsible for the fire.

7. Defendant's former partner also informed the PRPD Agents and that there was an arrest warrant issued against Defendant the day before (May 29, 2023) for violations to Puerto Rico's Law 54 and weapons law.

8. Agent Gonzalez contacted the special arrest unit of the PRPD as well as the commonwealth court and confirmed that there was an outstanding arrest warrant against Mr. Toledo-Villanueva.

9. The PRPD Agents, accompanied by Sergeant Santana, went to Defendant's place of residence in marked Dodge Durango patrol vehicle.

10. There was an outstanding arrest warrant for Defendant, but the PRPD did not have a search warrant for Defendant's residence.

11. When the PRPD Agents arrived at the street where Mr. Toledo-Villanueva's residence is located, Defendant was outside of his home, walking on the sidewalk towards the entrance of his residence, with his back towards the PRPD vehicle.

12. Agent Gonzalez was able to identify Defendant because Mr. Toledo-Villanueva's former partner had sent him a photograph of Defendant.

13. The PRPD Agents did not see any firearm on Mr. Toledo-Villanueva's person.

14. Agent Gonzalez further specified that he did not see any incriminating evidence on Defendant's person.

15. Agent Jimenez testified that the PRPD Agents did not immediately exit the vehicle and try to arrest Defendant because they were at a distance and the vehicle was moving.

16. The PRPD Agents testified that once Defendant noticed the presence of the PRPD, he increased his pace and proceeded to enter through the pedestrian gate and go inside of the residence.

17. Defendant had already entered the residence when the PRPD Agents parked the vehicle.

18. The PPRD Agents exited the vehicle and moved towards the residence.

19. Agent Gonzalez moved to the back part of the house to verify if there was any exit.

20. The PRPD Agents and Sergeant Santana verified the entrances and exits to the house and found that they were all closed and locked.

21. Agent Jimenez headed towards the windows located on the right side of the home. He identified himself as police, and repeatedly called Defendant's name, and loudly knocked on the windows.

22. Agent Gonzalez and Sergeant Santana guarded the back and left side of the residence.

23. Backup personnel from another police station were contacted for assistance to enter the residence and execute the arrest.

24. The PRPD Agents continued to call out for Mr. Toledo-Villanueva for approximately ten minutes until backup arrived.

25. The backup police agents brought a crowbar, and the PRPD Agents used it to pry open the back door of the residence.

26. Agent Jimenez entered first into the residence, followed by Agent Gonzalez, announcing themselves as the police.

27. The other PRPD personnel did not enter the residence.

28. The house was dirty with trash, papers, metal, parts, and appliances on the floor.

29. The PRPD Agents searched for Mr. Toledo-Villanueva until they found him in one of the bedrooms, laying down on the bed.

30. Agent Jimenez approached him while Agent Gonzalez stayed outside of the room by the door.

31. Agent Gonzalez described the room as dirty with trash such as parts, papers, and carboard all over the floor.

32. Agent Gonzalez testified that he could not remember exactly how the room was inside. He was shown a photo of a room from inside the residence and could not confirm if it was the room where Defendant was found.

33. Agent Gonzalez informed Defendant that he had an arrest warrant for him and instructed him to get up from the bed.

34. Agent Jimenez also told Defendant he was under arrest and proceeded to get him up from the bed.

35. When Mr. Toledo-Villanueva stood up, he had his back towards Agent Gonzalez.

36. Agent Jimenez conducted a preliminary check and found a loaded revolver on his right-side waistband.

37. Agent Jimenez notified Agent Gonzalez that he had found a gun.

38. Agent Gonzalez did not see the firearm.

39. Agent Gonzalez was approximately eight or nine feet away from Agent Jimenez and Mr. Toledo.

40. Agent Jimenez testified that as he was about to take Defendant out of the room, approximately one or two feet away, there was a "piece of furniture . . . like an upside-down file cabinet" and in there was a little bag with white powder, ammunition, drug paraphernalia, pistols, and a black Adidas bag.

41. Agent Jimenez testified that the furniture was square, like a table. However, the furniture was not flat, but rather it had a hole or a divot, and the items were placed on top.

42. Agent Jimenez also testified that the black Adidas bag on top of the file cabinet was open and part of the drug paraphernalia was inside.

43. Agent Jimenez seized the evidence with his bare hands.

44. The PRPD Agents did not take any photos or video of their interaction with Mr. Toledo-Villanueva or of where they found the items that were seized.

45. The Technical Services Division usually takes photos for the PRPD. Agent Gonzalez did not request that Technical Services enter the home and take photos of where the seized items were located.

46. Defendant was arrested at approximately 1:30 – 1:40 p.m. He was read his rights and taken to the Drug Division in Aguadilla to conduct a field test of the powdery substance that was seized.

47. Agent Gonzalez did not prepare any notes regarding the arrest of Mr. Toledo-Villanueva and the related seizure.

48. Agent Gonzalez did prepare a PRPD Incident Report regarding Defendant's arrest.

49. Agent Gonzalez' Incident Report does not include the details of the arrest, nor does it indicate what items were seized.

50. Agent Gonzalez' Incident Report does state that Mr. Toledo-Villanueva was armed but does not specify where the firearm was found or any details of the weapon.

51. Agent Jimenez did take notes stating that he seized three firearms, drugs (cocaine), and ammunition.

52. Agent Jimenez' notes do not specify where the firearms, ammunition and paraphernalia were seized from.

53. Agent Jimenez' notes also contain personal information regarding Defendant as well as the times at which the agent went to the drug unit and when the field test was conducted.

54. Agent Jimenez also prepared a PRPD Incident Report containing personal information about Mr. Toledo-Villanueva, his weight and height, and the law he is charged with having violated.

55. Agent Jimenez' report does not specify the evidence that was seized from Defendant's residence.

56. Agent Jimenez testified that this information was not included in the report because the case was transferred to the Bureau of Alcohol Tobacco and Firearms ("ATF") and therefore, he did not follow up on it.

### III. LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In

light of this Constitutional prohibition against unreasonable searches and seizures, "a search of an individual's home 'is generally not reasonable without a warrant issued on probable cause.'" United States v. Serrano-Acevedo, 892 F.3d 454, 459 (1st Cir. 2018) (quoting Maryland v. Buie, 494 U.S. 325, 331, (1990)). Moreover, the Supreme Court has explained that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are **per se unreasonable** under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (emphasis added).

In the case at bar, Defendant challenges the legality of the warrantless search of his home. "On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." United States v. Delgado-Perez, 867 F.3d 244, 250 (1st Cir. 2017) (quoting United States v. Winston, 444 F.3d 115, 123-24 (1st Cir. 2006)). The First Circuit has explained that "[b]ecause the prophylaxis of the Fourth Amendment is at its zenith with respect to an individual's home, **a warrantless search of a private residence is presumptively unreasonable unless one of a few well-delineated exceptions applies.**" Delgado-Perez at 251 (emphasis added) (quoting United States v. Infante, 701 F.3d 386, 392 (1st Cir. 2012)).

## IV.  STANDING

As a threshold matter, the Government contests whether Defendant has standing to raise a Fourth Amendment claim. "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 132, n. 1 (1978). To meet this burden, the defendant "must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized." United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988). In Aguirre, the First Circuit established a two-tier test to establish the existence of a reasonable expectation of privacy. First, courts must determine "whether or not the individual thought of the place (or the article) as a private one, and treated it as such."  Id. at 857. The following factors are relevant to this inquiry: "ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." Id. at 856–57. If the defendant satisfies this first step, courts must "then look to whether or not the individual's expectation of confidentiality was justifiable under the attendant circumstances." Id. at 857. "While property ownership is clearly

a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, ownership alone is not dispositive." United States v. Garcia-Robledo, 488 F. Supp. 2d 50, 63 (D.P.R. 2007) (citing United States v. Salvucci, 448 U.S. 83, 91 (1980); Rawlings v. Kentucky, 448 U.S. 98, 105 (1980)). Courts should also consider "any precautions taken to exclude others or otherwise maintain a privacy interest." Garcia-Robledo, 488 F. Supp. 2d. at 63. (citations omitted).

The Government argues that although Defendant claims that the residence searched is his, the property registry kept by the municipal tax office identifies Ms. Johnson, Defendant's half-sister, as the owner. (Docket Nos. 35 at 4 and 35-1). At the suppression hearing, Ms. Johnson testified that the residence originally belonged to their mother but, after her death, it became part of their inheritance. However, she further noted that Mr. Toledo-Villanueva had lived there his entire life and was the only person that lived in the residence. Additionally, Agent Gonzalez and Agent Jimenez both testified that when they arrived at the residence, all of the doors to the same were closed and locked.

In light of this testimony, it is evident that Mr. Toledo-Villanueva has a one-third ownership interest in the property and is the sole resident of the same. Importantly, sole ownership is not dispositive as the Government suggests. See e.g., Minnesota v. Olson, 495 U.S. 91, 98-99 (1990) (recognizing that an overnight

guest in a house can have a reasonable and legitimate expectation of privacy in their host's home). Furthermore, Defendant had possession, control, and historical use of the residence, as well as the ability to regulate access by third parties. Pursuant to the totality of the circumstances in this case, the Court finds that Defendant met his burden to establish he had a reasonable expectation of privacy with regard to the residence and therefore has standing to challenge the warrantless search of the same.

## V.   DISCUSSION

As a threshold matter, it is important to reiterate that the PRPD Agents in this case had a warrant to arrest Mr. Toledo-Villanueva. "It is black-letter law that an arrest warrant carries with it, by implication, a limited grant of authority to enter the target's residence so long as there is reason to believe that the target is inside." United States v. Pelletier, 469 F.3d 194, 199 (1st Cir. 2006) (citing Payton v. New York, 445 U.S. 573, 603 (1980)). Per the testimony provided at the suppression hearing, PRPD Agents saw Defendant entering his residence when they arrived at his street to execute an outstanding arrest warrant against him. The PRPD Agents also verified the entrances and exits of the home, finding them all to be closed and locked. The PRPD Agents therefore had reason to believe that Mr. Toledo-Villanueva, the target of the arrest warrant, was inside the residence.

Accordingly, the PRPD Agents had the limited authority to enter the residence to execute the arrest warrant.

The question before the Court is therefore whether the PRPD Agents lawfully searched and seized property without a warrant. The Government contends that the warrantless search and seizure complied with the law because the search of Defendant's person and immediate area was conducted in a hot pursuit, with evidence in plain view, and as a search incident to arrest. (Docket No. 35 at 1). The Court shall address the credibility of testifying witnesses and the applicability of the Government's purported warrant exceptions below.

### A. THE HOT PURSUIT DOCTRINE

The "warrantless entry and search of a residence may be reasonable, in Fourth Amendment terms, if the government can demonstrate certain exceptional types of exigent circumstances." McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 545 (1st Cir. 1996) (internal quotations omitted). "In determining whether there is an exigency sufficient to justify a warrantless search and seizure, the test is 'whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.'" United States v. Wilson, 36 F.3d 205, 209 (1st Cir. 1994) (quoting United States v. Adams, 621 F.2d 41, 44 (1st Cir. 1980)).

A "consistently recognized example of exigent circumstances encompasses the 'hot pursuit' of a suspect the police reasonably believe to be a felon." United States v. Soto-Beníquez, 356 F.3d 1, 36 (1st Cir. 2003). Under the hot pursuit doctrine, police may enter private residences without a warrant to arrest a fleeing suspect that they reasonably believe is a felon. Id. The purpose of the hot pursuit doctrine is to ensure that a suspect cannot "defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." United States v. Santana, 427 U.S. 38, 43 (1976). The Supreme Court has clarified that "hot pursuit means **some sort of a chase**, but it need not be an extended hue and cry in and about (the) public streets." Id. at 42-43 (internal quotations omitted and emphasis added). Moreover, even a brief pursuit can qualify as a hot pursuit. See id. at 43 ("The fact that the pursuit here ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into [the defendant's] house.").

Based on the evidence presented at the suppression hearing, the Court finds that the Government did not establish the applicability of the hot pursuit doctrine. Per the PRPD Agents' testimony, Mr. Toledo-Villanueva was already walking towards his residence, with his back to the patrol car, when the PRPD arrived at his street. Moreover, Defendant was already inside his residence

when the PRPD Agents parked the patrol car and exited the vehicle. No evidence was presented to establish that the PRPD called out to Defendant, turned on the siren of the patrol vehicle, or made any other attempt to notify Defendant of their intention to arrest or otherwise question him while he remained outside of his home. Therefore, the Government did not evince that the arrest began in a public place nor that a chase occurred. Thus, the hot pursuit doctrine is inapposite.

**B. THE PLAIN VIEW DOCTRINE**

Although the seizure of property by a police officer generally requires a warrant under the Fourth Amendment, there is an exception for items in plain view. *See* Horton v. California, 496 U.S. 128 (1990); United States v. Sanchez, 612 F.3d 1, 4 (1st Cir. 2010). Under the "plain view doctrine," a warrantless seizure is lawful if the following three elements are met: "(i) the police officer who effects the seizure lawfully reaches the vantage point from which he sees an object in plain view; (ii) probable cause exists to support his seizure of that object; and (iii) he has a right of access to the object itself." Sanchez, 612 F.3d at 4-5 (citing United States v. Allen, 573 F.3d 42, 51 (1st Cir. 2009); United States v. Antrim, 389 F.3d 276, 283 (1st Cir. 2004)).

As noted above, the PRPD Agents were lawfully inside of Mr. Toledo-Villanueva's residence to execute the arrest warrant. Therefore, the issue before the Court is one based on credibility:

namely, whether Agent Jimenez viewed firearms, drugs, ammunition, and drug paraphernalia in plain view on top of a piece of furniture approximately two feet away from where Defendant was arrested. Having observed Agent Jimenez's demeanor and heard his testimony that lacks sufficient details and specificity, the Court concludes that Agent Jimenez's account as to what he saw in plain view is not credible for the following reasons.

First, Agent Jimenez's testimony is inconsistent. Throughout his testimony, Agent Jimenez could not concretely describe the furniture upon which the items were allegedly found, referring to it as an upside-down filing cabinet, a table, and at one point a closet. Agent Jimenez testified that the furniture had a hole or divot and did not precisely articulate where the seized items were found in relation to the same. In one instance, he stated that the items were on top of the furniture, and at another point of his testimony he conceded they were inside of it.

Second, Agent Jimenez' testimony is uncorroborated. Agent Jimenez neither specified where the seized items were found in his notes nor in the PRPD Incident Report that he prepared. He purportedly failed to include this information in the Incident Report because the case was transferred to ATF. No photos were taken to show where the seized items were found, although the Court notes that the PRPD Agents testified they did not have an obligation to do so. Agent Gonzalez, the only other PRPD agent on

the scene who entered the residence, testified that that the aforementioned items were seized from the room where Defendant was arrested, but did not state where they were found, despite only being only eight or nine feet away from where Agent Jimenez handcuffed Mr. Toledo-Villanueva. When Agent Gonzalez described the room where Defendant was found, he only described the trash, not any item of furniture.

Third, the claim that the seized items were found in one location and in plain view is questionable. Per Agent Jimenez' testimony and the Government's briefing, the following items were **all** in plain view, on top of a piece of furniture, two feet away from where Defendant was lying on a bed: twenty-seven rounds of .38 caliber ammunition; one round of .22 caliber ammunition; two pneumatic pistols; seven rounds of 9mm pneumatic rounds; one plastic baggie of cocaine; and drug paraphernalia. For these reasons, the Court concludes that the Government did not meet its burden of showing the legitimacy of the search and seizure under the plain view doctrine. *See* Delgado-Perez, 867 F.3d at 250.

**C. SEARCH INCIDENT TO ARREST**

Another recognized exception to the warrant requirement for searches and seizures applies to searches incident to a lawful arrest. *See* Arizona v. Gant, 556 U.S. 332 (2009); Chimel v. California, 395 U.S. 752 (1969). The scope of a permissible search incident to an arrest applies to the arrestee's person as well as

"the area from within which he might gain possession of a weapon
or destructible evidence." United States v. Jadlowe, 628 F.3d 1,
13 (1st Cir. 2010) (quotations omitted).

After executing the arrest warrant, Agent Jimenez searched
and patted down Mr. Toledo-Villanueva's (*i.e.*, the arrestee)
person. Pursuant to Agent Jimenez' testimony while conducting the
pat-down, he found a loaded revolver on Defendant's right-side
waistband. Agent Jimenez notified Agent Gonzalez that he found a
firearm on Defendant's person in the moment. Agent Gonzalez did
not see the revolver in question; however, Defendant had his back
towards where Agent Gonzalez was standing.

The Court finds that the PRPD Agents' testimony as to the
discovery of the revolver on Defendant's person is credible. Unlike
with the items purportedly in plain view, in this instance, Agent
Jimenez was able to clearly specify where the revolver was found,
namely on the right-side of Mr. Toledo-Villanueva's waistband.
Although Agent Gonzalez did not see this weapon, he explained that
the reason why was because Defendant's back was toward him. Agent
Gonzalez also testified that Agent Jimenez verbally notified him
that he had found the weapon in the moment. Accordingly, the
Government was able to evince the legitimacy of this search and
seizure pursuant to the well-established search incident to arrest
exception.

**D. APPLICATION OF THE EXCLUSIONARY RULE**

Lastly, the Court must "determine whether the fruits of that Fourth Amendment violation ought to be suppressed." United States v. Mata-Pena, 233 F. Supp. 3d 281, 293 (D.P.R. 2017). "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." Wong Sun v. United States, 371 U.S. 471, 485 (1963). However, the "exclusion of evidence does not automatically follow from the fact that a Fourth Amendment violation occurred." Davis v. United States, 564 U.S. 229, 244 (2011). (citations omitted). Rather, the exclusionary rule applies only where its purpose, namely to "deter future Fourth Amendment violations[,]" is "effectively advanced." Id. at 236-237, 244.

To trigger the exclusionary rule, the police conduct at issue must be sufficiently deliberate, reckless, grossly negligent or consist of a recurring or systemic negligence, so that the deterrence achieved by suppressing evidence is worth the price paid by the justice system. Herring v. United States, 555 U.S. 135, 144 (2009). On the contrary, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way[.]" Davis, 564 U.S. at 238 (internal quotations and citations omitted).

The record does not reflect that the PRPD Agents had an objectively reasonable, good-faith belief that their conduct was lawful. Both Agent Gonzalez and Agent Jimenez were aware that they did not have a warrant to search Defendant's home and therefore were not entitled to do so. In the absence of evidence or testimony to support their contention that the evidence seized was done so lawfully, the Court concludes that it must be suppressed. Moreover, the Government does not cite to any analogous cases holding that similarly seized evidence should not be suppressed. *See* Local Rule 7(a) and Local Rule 112.

## VI.   CONCLUSION

In accordance with the above, the Court hereby **GRANTS IN PART** Defendant's *Motion to Suppress* at Docket No. 29. Furthermore, the Court **SUPPRESSES** the following physical evidence that the police recovered from Mr. Toledo-Villanueva's residence: two pneumatic 9mm pistols; seven rounds of pneumatic 9mm ammunitions; twenty-seven rounds of .38 caliber ammunitions; one round of .22 caliber ammunition; drug paraphernalia; and one plastic baggie containing a powdery substance.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of May 2024.

S/RAÚL M. ARIAS-MARXUACH
UNITED STATES DISTRICT JUDGE